And Mr. Sullivan. Thank you, Your Honor. May it please the Court, John Sullivan on behalf of the State Defendants. And I should say, just because I gave everybody all this extra time doesn't mean you have to use it. Okay, go ahead. This Court's decisions in all State and Ford resolve this case, even apart from the alcohol aspect. The Texas ban on corporations holding liquor permits does not discriminate on the basis of an interstate element, and it treats similarly situated in-state and out-of-state businesses the same. Therefore, there is no dormant commerce clause violation. Any conclusion that determines otherwise Okay. What case says that a discriminatory intent without a discriminatory effect is not a reason to set aside a statute? So there hasn't been a case that says that, Your Honor. What this Court's cases have said is that you've got the two, two different pieces you can look at under Prong-1, a discriminatory purpose or discriminatory effect. The discriminatory purpose piece is always tied to the text of the statute. That's seen in this Court's case in Dickerson. That's 336 F. 3rd 396. That's Cooper 1, Cooper 2. Over and over again, this Court points out that the discriminatory purpose piece can't be divorced from the text of the statute. So, which makes sense. Otherwise, you would get just a free-ranging inquiry into intent standing alone, which Isn't that what purposeful discrimination means? No, Your Honor. Again, I would point you to the Dickerson case at 396. For purposeful discrimination, one looks at the text of the statute. That goes back to Bacchus, which is But, I mean, Arlington set out all those factors for determining whether you have a purposeful discrimination. What does that mean? It did, Your Honor. But in that case, there's discrimination that's taking place on an ongoing basis against racial minorities, and you're not switching groups again in that case. That's important to remember for Arlington Heights. But all the — pretty much all the cases salute Arlington Heights before they say anything else. Well, Your Honor, so Arlington Heights will look for intent, but that's because Arlington Heights starts with the premise that a disparate impact isn't going to be enough on its own. So it's, again, and that context is different than the Dormant Commerce Clause cases, where Arlington Heights can't be used to overcome the Dormant Commerce Clause cases, which, like this Court has stated in all State, Ford, the Supreme Court stated in Exxon, when you have similarly situated entities that are being treated the same, there's no discrimination in the statute based on any sort of interstate element, there's no discrimination based on the place of domicile of the businesses, then there's no Dormant Commerce Clause case in — excuse me — violation in those cases. Now — But, I mean, we have these, like, cases where bars are requiring a certain dress code that on its face sounds neutral but actually discriminates against people of a certain race. What do you do with that? I mean, and they're trying to keep out people of a certain race. Now, you could say the people of that race can wear the clothes that this bar is seeking, absolutely, so it treats everybody equally. Everybody has to wear, you know, a tie or But yet the purpose was to keep out people of a certain race who don't want to wear that or want to wear something different that's being — So, Your Honor, if you were looking at perhaps some sort of equal protection scenario where, you know, say it's discriminating against a religious minority that's trying to wear a certain garb or something along those lines, I think that would be a different case than trying to apply racial discrimination factors in the Dormant Commerce Clause context. But, at the least, Arlington Heights can't be used as a workaround for what this Court has held in its other — So help me with that. You're saying that when we're talking about race and religion, then discriminatory intent is enough to invalidate, but when we're talking about Dormant Commerce Clause, it's not? It's enough because there's already the actual discrimination that's taking place. Here we have out-of-state corporations that are barred from entering the market. We have in-state corporations that are barred from entering the market. We have in-state businesses that sell liquor. We have out-of-state businesses that sell liquor. So there's no actual discrimination that's taking place. So there's no — you don't go look for what the legislature might have intended in — you know, again, even questioning how that inquiry works when there's not discrimination that's taking place and it's not in the text of the statute. Again, so this goes back to Bacchus, right? Bacchus, the statute didn't say we're only going to — you know, we're going to preference Hawaii alcohol producers. It didn't use that interstate element. Instead, it talked about the root and the Okileo alcohol that was only indigenous to Hawaii. So it found a different way to — for the text of the statute to actually show discrimination. But you say the only way you can find discriminatory purpose is if the statute explicitly makes that distinction. Not explicitly, Your Honor, but again, I would point you to Bacchus. I would point you to this Court's case in Dickerson. Well, what does the statute have to do in order to make it — I mean, there's no way that you could have a statute that's purposefully discriminating, favoring local business, unless you say that you're doing so? No, Your Honor. So, again, I would point you to Bacchus. I would point you to Dickerson. The purpose prong, the discriminatory purpose piece, under Normant Commerce Clause jurisprudence, always looks to the text of the statute. That's where — No, Your Honor. You can also look to discriminatory effect. That's the second prong. That's the second piece. Or if the — if the reason given for adopting the statute favoring local business is totally pretextual, surely you can look at that. If it were totally pretextual, I think then you would — you would look at perhaps the rational basis arguments. But that's not what we have here, Your Honor. So, again, the — So if the reason for adopting the statute favoring local business is pretextual, then it's under Arlington Heights and all the Normant Commerce Clause cases, you can say a court can find that that's adopted for a discriminatory purpose. Again, Your Honor, I think that would look — Can you give me an answer to that? I think — I think that's not exactly correct. I think that looks more to the rational basis piece rather than, again, the — or perhaps the — that could go into the effect prong, the second part. But I guess what I'm saying — so getting back to my example in this bar, maybe they're wrong. They're stereotyping people of a certain race or stereotyping people of a certain religion, whatever we want to say. They're stereotyping people to say this will keep them out, so we're going to pass this — this. And I realize that's not — so let's say the legislature adopts that. They think that by passing a certain dress code for bars, they're going to keep certain people out of bars. But they're wrong. Do we still bless that statute that was passed with that discriminatory intent of keeping out certain people? Your Honor, if there's no discrimination taking place, then there's no Dormant Commerce Clause violation. No, I understand that. But so you are saying the Dormant Commerce Clause analysis is different than other constitutional analyses in this way. I mean, I know you're saying it in a lot of ways, but in this way, that discriminatory intent can never be a violation of the Dormant Commerce Clause, which I thought is contradicted by our precedent. No, Your Honor. It's not, because we're separating intent from, again, what the — under the jurisprudence, you look for a discriminatory purpose. That's different than just a naked legislative intent behind the law. Okay. So the discriminatory purpose is, again, can you see what the legislature was trying to do with respect to the text of the statute? Again, look at Dickerson, look at Allstate, look at Ford. There can't — Arlington Heights can't serve as a workaround for those cases. Now — Let me ask you, why doesn't the record in this case support the trial court's finding that this out-of-state corporation ban for getting a liquor permit was contextual? Why doesn't the record support that? Your Honor, it's just — you look — that's not what the Dormant Commerce Clause analysis looks at. Answer my question, if you can. Your Honor, I can't answer that. I would say that there was record evidence pointing both ways. Tell me what it was. On which part? Well, what about the accountability justification? The only person who testified before the legislature was, I guess, your general counsel, who said the reason they adopted the statute was because foreign corporations are not accountable. And the judge found that that was pretextual. And that's the only reason that was given to the legislature. So, Your Honor, that was actually the representative from the TPSA. Okay. Industry representative. Yes, Your Honor. Who drafted the bill. Yes, Your Honor. Can you answer that? Can I go? Yeah, you can answer. So, I think that there were — again, if you're looking at the legislative history, you have to look at the only statements made by a legislator at all were the ones we highlighted in our brief. You had the two statements that could be taken — seemingly should be taken in favor of saying that the reason Texas is interested in these types of alcohol regulations is because of the proliferation of liquor and because of accountability problems, because not just dealing with price also, but dealing with the density and the spreading out across the state, if big corporations are allowed to hold these permits. There was evidence before the committee on that? Those were just the only statements in the record from a legislator. And that's it. That's it. Are we — We reserve time for rebuttal. Thank you. Mr. Waldron? Thank you, Your Honor. I'll start right where we all left off. Intent — I want to be clear about something. Intent is never — raw intent of a legislative body is never enough to strike down a lawful statute. Not ever, not under any constitutional theory. Case law for that. There is case law for that under the Commerce Clause, and that's the Winn case, which is quite — is fairly recent. And in the Winn case, in footnote 4, the Supreme Court expressly says the Commerce Clause is concerned with effects, not motives. In the O'Brien case, which was a much broader expression by the Supreme Court about how to deal with intent across the board in constitutional analysis, the Supreme Court says, it is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an illicit legislative motive. As the Court long ago stated, the decisions of this Court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exercised. And, of course, a simple — What were you quoting from there? United States v. O'Brien, Your Honor. It's cited many times in our brief, and it is a — it is — I just want — I just — I'm sorry. Here's — and here's the thing. A simple thought experiment will illustrate this constitutional principle. And, by the way, there are other constitutional cases out of the Supreme Court articulating the same thing with respect to other areas of the law, criminal law, exclusionary rule. You will find other cases. The Causey case cited in our brief, where the Court says we're not looking at the subjective intent of the State actors. We are looking at the constitutionality of the State action. And, of course, that has to be the case. Of course it does. Take this example. Let's say that Texas passes a public corporation ban related to the sale of hard liquor, and does so with the blackest of hearts. We are trying our dead-level best to keep — to hurt interstate commerce and keep out foreign actors, but we don't — we don't accomplish it. What we've done is, as the Court found here, passed a statute that does not, in fact, discriminate. Let's say — and so if we're going to do it based on intent alone, and I use that word advisably because I want to come back to your question, Judge Davis, about purpose. But if we do it on — if we strike that statute down on intent alone, we're striking down a perfectly constitutional, legitimate statute based on legislative intent by itself. And what we're going to say is, if New Mexico decides they want to pass a public corporation ban, which is completely fine, doesn't discriminate, absolutely constitutional, but they do it with pure hearts, New Mexico gets to have a public corporation ban, but Texas does not. Constitutional law plainly cannot operate that way. You couldn't have the exact same statute that functions exactly the same way in two different States, and in one State it's not constitutional, but in the other State it is constitutional based on a judicial determination of what was in the hearts and minds and the motives of the legislature. In all States, we said if the statute impermissibly discriminates, then it is valid only if the State can demonstrate under rigorous scrutiny that it has no other means to advance legitimate local interests. You absolutely said that, Judge Davis, in all States. I thought it sounded good. It does sound good, and it's correct. But that refers to a statute that discriminates. Our statute doesn't. That was one of the few things we were able to get out of our trial court in this case, is a clear, absolutely clear and unambiguous finding that this statute, this public corporation ban, is neither facially discriminatory nor, in fact, discriminatory. It had a discriminatory purpose. Now, that's where I wanted to get back to. Thanks for bringing us back to it. Discriminatory purpose versus discriminatory intent. You hit it right on the head, Judge Davis, when you said everyone pays a — what phrase you used was paid homage to Arlington Heights factors before they talk about discriminatory purpose. He said salutes. Salutes. That's right. Thank you. I couldn't remember exactly what it was. Here is why, and here is why it matters, and here is why this Court ought to clarify this point. Arlington Heights has four factors. The very first factor is a showing whether a clear pattern of discrimination emerges from the effect of the State action. That is the very first Arlington Heights factor that goes into measuring discriminatory purpose. So obviously, discriminatory purpose, as that is used as a term of art, is different from just naked legislative intent because it's got effect built into it. And that's exactly what you said, Judge Davis, in Allstate, and you were right. And so you cannot have discriminatory purpose for Commerce Clause purposes unless you also have a clear pattern of discriminatory effect on the basis of the statute, which goes back to the thought experiment I just gave you. You cannot have an unconstitutional statute based on an illicit legislative motive all by itself. You can't have that under Arlington Heights. Arlington Heights is an underpinning that the U.S. Supreme Court has carried along with the discriminatory purpose idea. And to go to Judge Haines to the example you used, you used an example that, in fact, has effect embedded in it. Your example on the bar and the clothing, the effect of actually effectively precluding people is built into that example. Well, but what I'm saying is what if the legislator is mistaken? The legislator thinks people of a certain race that the legislator is trying to exclude won't wear the clothes they're acquiring or would wear the clothes they're excluding, and that this will have this effect, but he's just wrong. Right. Would we say, oh, well, good enough, then. You were wrong, so we get to leave this discriminatory intent statute in place. Yes, you do. You absolutely do that. You do it across the board in unconstitutional law, because it would be insane to do otherwise, truly. Let's say, take a legislature that is trying its dead-level best to do the most heinous discriminatory act, and is just not competent enough to do it, and passes a statute instead. And I'll be candid. I've done a fair amount of legislative work, and I've actually seen stuff like this go, illicit motives that just don't get translated into statutes. This happens. But let's say that happens. And the court is looking at a statute that is absolutely, perfectly constitutionally sound. The State action is the statute. That statute is just fine. But is a court going to go over here and say, I'm going to mess around in committee reports, I'm going to look at testimony, I'm going to look at what happened at the legislature, and I'm going to look into their hearts and decide what their actual motives were? And if their motives were wrong, even though they passed a perfectly legitimate law, I'm going to strike down that law. All right. Edbie. I have a better, more narrow analysis here. It seems to me you can get where you're trying to go simply by looking at, in Vesey v. Abbott, we reversed at the panel and on bonk level, because the district judge had relied on improper evidence. Now, it's different evidence. It's obviously a different statute. We're dealing with the voting rights and so on, which is a different world. But isn't that the argument you're making here? I mean, do we have to go as broad as to say, hey, legislature, go out there, discriminate, do what you want, just as long as you screw up and don't actually discriminate, we're good. You don't have to. Well, we don't have to go that far, do we? Absolutely do not. And I'm glad you're— That's the argument I'd be making standing where you are. It raises the point, and at the same time I'm answering your question, Judge Haynes, I'm going to answer your question, Judge Davis, about accountability. No, you don't have to go that far. The only evidence that the trial court relied on to strike down this statute were these pieces of evidence. A big chunk of it was much later post-enactment actions by lobbyists in repeal efforts. You, Judge Haynes, said in Veazey, you can't look at post-enactment statements at all, not even legislative statements. The court said it. The court said it, absolutely. In fact, the whole court said it, as it turns out. The—and so you can't look at that. Judge Pittman looked at prior discrimination. Abbott v. Perez, this court's prior James case, has said you can't simply say that because there was a prior act of discrimination that that alone invalidates. That's what I wanted to get to. How does a district judge distinguish—so there's past discrimination in a state, now they've been called out by the courts and they've got to deal with that. How does a district court distinguish between proper response to that by passing a correct statute and discussing why they're doing it, they're trying to deal with it, versus trying to get around what the courts did? It has—the only way the courts can deal with that is by looking at what actually happens during that legislative session. To answer your question about accountability, there was other—the statement made by the only person that testified in favor of the bill was accountability and size. And size was the critical feature of it because that's the critical feature of this bill. It distinguishes between large firms and small firms. That's what it does, not in-state and out-of-state. And that was before the legislature at the time. And frankly, it was the only thing that was. You know, Arlington Heights has a long—one of the factors in Arlington Heights is a history of discrimination. We can't consider that? You could if there was, in fact, a history of discrimination that, in fact, carried on. But here's the problem in this case. Well, let me ask you this, though. I mean, we struck down the old statute, which was—had an explicit favor to locals as opposed to out-of-staters. And it took 12 years before you started observing what we had done. I mean, we had to have an injunction entered against the state before they would comply with our ruling. Well, actually, that's not exactly how it worked, Your Honor. They enacted some statutes to try to move it out. But, I mean, it seems to me the judge had perfectly good reason for finding that accountability excuse and was totally—no good reason. Yeah, that's just factually incorrect about what happened. The Macbeth case actually struck down and enjoined one type of mixed beverage on-premise permit, and that's what it enjoined. It didn't enjoin literally any of the other permits in Texas, including the peat permits, which are at issue here. They weren't at issue in Macbeth. Now, ultimately, and the TABC quite rightly took the position this injunction applies to what it implies to, and it's not any of these other permits. Later, the rationale, people argued the rationale of the Macbeth case should apply to these other permits as well. When that argument was, in fact, made and a district court agreed with it and entered an injunction for that, which was 12 years later, that injunction was complied with. So that's the actual history of it. One of the reasons given for enacting this statute was they liked the business climate that had been going on in the past. They liked the—which I think the judge could read as saying, we don't want pesky competition from out-of-staters. We didn't want pesky competition from big shops and big firms. They figured out that what caused the business climate in Texas was big versus small, not out-of-state versus in-state. And big versus small is an absolutely legitimate distinction to make under the Commerce Clause. You said it in Allstate. The Supreme Court said it in Exxon. The Supreme Court has reiterated that in CTS. The— Well, but in Allstate, we had all kind of evidence in the legislative record about the evils of letting the insurance company come in and run the body shops. It encouraged predatory practices. We have one witness who testified in this legislative year. Well, it's not incumbent on the legislature to prove that the statute doesn't discriminate by effect. It is incumbent on the challenger to prove that it does. And without that proof, then the challenge, the constitutional challenge has to fail. That's one thing the trial court did here. If you look at the trial court's opinion, the opinion very subtly inverts the burden of proof, suggesting that the Respondents have to prove that the statute is okay. Are you done answering, Judge? I am. Okay. I gave you all extra time. You used more than that. You've saved some time for rebuttal. Thank you. Thank you. May it please the court. Counsel. My name is Stephen Shepard. I represent Walmart and its affiliates. Let me go right to Mr. Waldrop's contention that this is a case where the legislature was simply not competent to have the causal effect of excluding out-of-state competition. That is absolutely not true. The district court found in its opinion that there was a disproportionate burden placed by this law on out-of-state competition. But that's only because the world that the judge looked at was the world of big companies from out-of-state. If you said, well, what if the Walton family that still lives in Arkansas, I don't remember who from the Walton family does, but I imagine somebody does, decided they wanted to show up and open up a liquor store, it would be nothing to keep them out. It's because they want to do it through Walmart, this giant company. Just as if, you know, Mr. 7-Eleven's great-grandson or whoever it is, decided they wanted to come in and open a liquor store, they're a Texas company, but the 7-Eleven would also be barred. Why isn't that the answer to that? You're just looking at the big companies from out-of-state don't want to, are the only ones that would come in. But that doesn't change the fact that billionaires like the Walton family could come in any time they felt like it and start opening these package stores. Because, Your Honor, the credible entrants who were threatening the in-state business that existed before this Court's Cooper decision, the credible out-of-state entrants were those companies with the capital. You don't think individual billionaires are pretty scary? If you're on the mom-and-pop store in Tyler, Texas, you don't think I'm pretty scared of the Walton family with or without Walmart? It is true, Your Honor, that the revised statute allows some out-of-state companies to come in, but look at the actual effect as found by the District Court. The 98 percent of all of the package store permits in Texas, 98 percent are held today by firms wholly owned by Texans. That is caused by these two statutes. And before I turn to our expert analysis, we can take TPSA's word for this. In the record excerpts before the Court at tab 7, I'm looking at record 14051, there's sworn testimony from the TPSA, the Industry Association, which says, quote, the reason for this 100 percent Texas ownership is the five-store limit and the consanguinity exception and the third law that prohibits the ownership of liquor stores by large corporations. That's kind of interesting. I mean, this is why they were arguing about the time. They said, we aren't necessarily pals over here. We may be arguing for the same end result, but we ain't necessarily pals. So how can we hold the industry representative against the state? Because we still are dealing with a state statute that you're asking a federal court to overturn, and that's always a big deal, no matter how you frame it. How can we do that based on some statement by an industry representative who doesn't bind the state? Because my quote, the reason I gave you that quote, Your Honor, is because it goes to a question of fact. The TPSA's lawyer has stood up here and said, there is no effect at all. The legislature was incompetent. All that Wal-Mart's case is based on is blackest hearts and stuff like that. That's not what the TPSA representative said in sworn testimony to the legislature and then reaffirmed at trial. The statement I just read was by a member of the executive. Where did the Texas TPSA come to the legislature when this was passed and say, you're going to be able to keep out-of-state people out? I thought it said, talked about accountability. The only reason given was accountability, Your Honor. Right. So if a doctor comes in and says some junk science, but I'm sitting there as a legislator, I don't know any science, and I go, okay, that sounds good, and I go with that, and later he goes, well, that was junk science, I'm still the one who followed what they said based on what they said, not what was in their heart where they're laughing and crossing their fingers behind their back. I didn't see that. I heard X, you know, causes cancer, and so I vote to exclude X, and it turns out that's junk science, but I didn't know that. Why isn't that the situation here where this guy is maybe laughing in his heart about getting up and saying all this crazy stuff, but if he says some facially neutral things and the legislature goes with that, accountability, sounds good, sign off on it, why isn't that the end of the story? This now goes to one of many factors under Arlington Heights that shows the discriminatory purpose of the statute, and that's the factor of legislative history. As this court in V.C. made clear, circumstantial evidence is acceptable and often used because legislators know better than to say the quiet part out loud and say the reason why they are adopting a statute. But what circumstantial evidence is there that the legislators knew what was in the heart of the person testifying accountability? Here I am talking about accountability, but in my heart I'm laughing and saying this will keep Walmart out. Two answers to that, Your Honor. One, the lack of any evidence of a need for accountability. The legislature is presumed to know they have 75 different types of alcohol permits. That's as of the date of trial. Public corporations could hold every single one of those and had since 1935. In 1993, in House Bill 1445, out-of-state public corporations were able to come in and hold nightclub and bar permits, those are the mixed beverage permits, beer and wine retail permits. There was no evidence of any problem. There was zero evidence given to... I mean, look, off-premises liquor sales are just very different in Texas. They are. A dry county will have beer and wine at the store, it will have beer, wine, and liquor at the restaurant, and it will not have a liquor store. So nobody mentioned this, but y'all are acting like that's not the case, but it is. So liquor is just treated differently when we're talking about buying a bottle of rum versus a glass of margarita at the restaurant where the waitress can say, all right, you've had too much, sir, I'm not going to serve you anymore, versus if they sell you a bottle of tequila, a giant bottle of tequila, I might add, they don't know if you're going to go out in your car and start slugging it down and then drive down the highway. And so why is that not something we can say is treated differently and therefore the legislature is not acting discriminatorily by treating it differently? Because none of the laws being challenged here, Your Honor, go to how retailers apply their trade in the package store industry. There are laws on the books that require a separate premises for a package store, that require the associates to be of a certain age, that require certain opening hours. Walmart would comply with all of those. None of those are being challenged. The laws being challenged here discriminate on the basis of who the entrants are. And there's an example that really shows this clearly, Your Honor, which is what Costco has had to do, another public corporation, in order to offer its customers liquor at their locations. It's described in the record at 9937, and there's a photograph of it at 14224. You go to a Costco in Texas, and you see the photograph. There's the main entrance to the store, and there's a separate entrance right beside it as you walk in that says liquor. The land is owned by the Costco. But that part underneath the liquor sign where you can buy it is leased to a separate corporation called Western Beverages. It's one of those package store chains listed on page 6 of the red brief. It's Texan-owned, and they sell the liquor. Costco can only be the landlord for that tenant. Why is a corporation, simply because it has more than 35 owners, barred from competing with that Texas package store chain located in the exact location doing the same thing? The reason why is that a law was passed to keep that business in the hands of Texas. The problem with that, we've got three branches of government, and when the judiciary starts interfering with the legislature, they have to be very, very careful and make sure they're applying the Constitution correctly. Because the fact that a statute is passed for a purpose and doesn't perfectly enact that purpose is not a reason to knock it down. We would be very busy knocking down statutes if that were the analysis. So if they're passing it for accountability and reducing the amount of liquor consumption and this kind of stuff, and that's not working perfectly because Costco is able to open up this liquor store next door, even though they're only the landlord and all of that, and maybe the Western Beverage people don't answer their phone either and so on and so forth, it doesn't mean that's not a basis that we still have to honor. It's a question of whether we can strike it down, not whether this was a perfect piece of legislation or a good idea or any of those other things. If it's a stupid idea but it's constitutional, we're done as the judges. My point, Your Honor, was that this law that's under attack does not regulate how liquor is to be sold. It only excludes certain categories of people, and that exclusion of those categories was intended to be as good a proxy as possible for the likely out-of-state entrance, and it has worked. This is not a case where we are indicting the legislature just for black hearts. It has worked. Look at the numbers of the permits. That permit number, that 98 percent, that came from the TABC at trial. Let me ask you, what's your answer to counsel's overriding argument that in a dormant Commerce Clause attack, courts cannot look at the legislature's intent or purpose? Your Honor, that argument has never been endorsed by a single appellate court, and it was expressly rejected by the Hazeltine Court in the Eighth Circuit and by the Waste Management Court in the Fourth Circuit. Adopting that rationale would create a clear circuit split with those two different cases, and the Court's opinion in Allstate already sided favorably to that Fourth Circuit opinion. The Hazeltine case from the Eighth Circuit is very similar to this one. In that case, the Court decided based on discriminatory purpose alone, and what South Dakota had done was pass a law saying no corporation can own a farm or conduct farming in South Dakota. And the reason for it was to exclude out-of-state companies, most of whom were corporations. That discriminatory purpose was reason to apply strict scrutiny. What counsel for TABC and TPSA are doing are trying to confuse two separate lines of cases. There's the one line that we've been discussing that goes under discriminatory purpose, where you look at all of the Arlington Heights factors. Mr. Waldrop attacked the first factor, disparate impact, and seemed to suggest that we lost under that factor. We didn't lose. The district court here went down each of those Arlington Heights factors, including the first one, and based on the numbers and the expert testimony, found there was a disparate impact against out-of-state entrants. It wasn't perfect. Nobody's saying this is a facially discriminatory statute or that 100% of out-of-state competitors are excluded. Of course not, but it's a hugely disproportionate burden. In fact, the district court's holding on this point. But only hugely disproportionate if you're looking at the world of Walmarts, right? I mean, you're looking at excluding large public companies rather than just everybody who might could, you know, the guy that lives across the border in Oklahoma and wants to open up a liquor store in Amarillo or wherever. Yes, Your Honor, and the reason for that is that it's only that world of large companies that have the capital and scale to expand that are the realistic potential entrants. See, that's the problem. If I can define the world, I can win any case. So if I can define who's being discriminated against, I can always find a definition where I'm going to win, just as if I'm on the other side, I can always find a definition where I'm going to win. And so the question is not how can you define it in a way that Walmart wins or how can you define it in a way that Walmart loses, but how should it be defined under our case law, in the Supreme Court's case law. And I thought facially neutral, pretty good start. There are three different reasons for applying strict scrutiny, as this Court's decision in all state makes clear at the beginning. One is a statute that's not facially neutral. If it facially discriminates, of course strict scrutiny. The second test is the Arlington Heights factors. The third reason for applying strict scrutiny, which is being confused here, is based on the effect alone. That's an alternative basis for affirming for us. We've said that our evidence of disparate impact and disproportionate burden is so strong that the Court on that basis alone should apply strict scrutiny. That's where we lost in front of the district court. That's the Pike factors, right? No, Your Honor. It's the discriminatory effects test with capital D, capital E, discriminatory effects alone as a reason to apply strict scrutiny. And what's your best case for that? The best case for that comes from out of circuit, Your Honor. I'd cite you to two. One is the Kachia case against Islamorada, where the township enacted a law saying no formula restaurants could open up in the town. And that applied even-handedly. It applied to formula restaurants that were based in Kachia. It applied to formula restaurants in interstate commerce. It was a disproportionate burden on interstate commerce because the vast majority of the potential entrants who were formula restaurants were the out-of-state companies. You had expert evidence at the trial on that point, I know. Was there any contrary evidence? No, Your Honor. The contrary evidence was disputing what should be measured. In other words, there was no contrary evidence that went to the heart of the analysis. Instead, it was evidence more toward the questioning from Judge Haynes to the effect that, well, there are a lot of out-of-state people who wouldn't be barred because they're not public corporations. Turning to the Pike analysis, Your Honor, that is an alternative reason to affirm what the district court did here. The same disparate impact that was relied on as the first factor of the Arlington Heights test also means that this law should be reviewed under Pike to see whether the burdens on interstate commerce clearly outweigh the putative local benefits. We win on that. We won at the district court, and this court can affirm on that basis alone. Alcohol laws are struck down under Pike. The Seventh Circuit did that in the Bode v. Heath case, which we cite. And in this weighing that has to happen, there are two important considerations to keep in mind. One, Pike instructs, look at the alternatives that are available to the state legislature in order to accomplish the supposed benefit. And the benefit now, Your Honor, here is supposedly indirectly reducing consumption by raising prices. The obvious alternative means is to impose an excise tax, a higher tax on the liquor that is consumed. All five experts at trial from both sides testified that is an effective way to raise the price, obviously raises it, you've taxed it, and thereby — Isn't it problematic, though, for us to make the choice for the legislature to enact a tax? And that's not what this court would have to do, Your Honor. The experts at trial gave a range of other alternative means that the legislature could use, restricting the number of stores that could open. This court does not need to tell the legislature what to do. All this court needs to affirm is the district court finding that there are many alternative means available. What else besides the tax? The restriction on the number of stores that could open at a certain location, Your Honor. Third would be a direct regulation by the TABC. There's evidence in the record from the licensing director that there is a statute on the books prohibiting excessive discounts. That's a quote from the statute that the TABC could enforce. And that record site is 10644. You know, those Pike cases seem to me to be all over the board, and most of those cases involved legislation that impeded the flow of goods, like Pike itself was a cantaloupe case. Many of them do, Your Honor, but not all of them. So I draw your attention to — And that is a difference. I mean, liquor can come in freely across the state lines, so then the question is just how it's sold, which is a little different. It is, Your Honor, but as this court made clear in Cooper both times, Cooper I and Cooper II, discriminating on the basis of who the retailer is, if that's done on the basis of out-of-state versus in-state, that's a violation of the Dormant Commerce Clause because it's so important. But if Cooper had resolved this issue, I wouldn't be here. So obviously it didn't resolve this issue. It was just a preamble to this issue. On the Pike point, Your Honor, Pike is not limited just to flow of commerce cases. You can see that in the Yamaha case from the Fourth Circuit, which we cite in our brief, where the law at issue required or allowed, rather, motorcycle dealerships to protest if a new dealership were going to open in the state of Virginia. It didn't say anything about the flow of motorcycles. It just limited who could be a dealer in the state of Virginia. Another case for the same point, also decided under Pike, is the R&M oil and supply case from the Eighth Circuit in 2002. There the law dealt with who could be a propane retailer in the state. And the requirement was in order to be a propane retailer, you had to have a large tank. Didn't do anything about the flow of propane. Didn't say anything about where propane came from. It was a restriction on who could be a retailer in that market. And the same thing is true here. There's ample basis to use Pike as an alternative basis for striking down the district court. If I could turn now briefly to the alternative equal protection basis for striking down this law under the St. Joseph Act. It's a little bit funny to have a large public corporation saying they're a protected class. This court does not need to find that Walmart or corporations that are publicly traded are a protected class at all. It's just a little hard to envision that when they were passing the 14th Amendment, their concern was a billion dollar corporation. But I understand that equal protection can apply here. I just find that stretching a little bit. The rational basis test is a test, although low, that all statutes must comply with in order to be constitutional under the 14th Amendment. And this law, both laws that are at issue here, fail it. Briefly on the… I mean, other than St. Joseph's Abbey, which is a very specific case about a very specific law, what have we struck down on rational basis? The Supreme Court struck down a Texas law under City of Claiborne, which was – and affirmed this court's decision in that case. In that case, which is similar to this one, the City of Claiborne had said if you are a home for the mentally challenged, you need a special permit. If you're any other kind of group home, like a fraternity house, an apartment house, you can use your land without getting a special permit. The Supreme Court, applying rational basis, not any heightened scrutiny, said that is unconstitutional discrimination. The reason why? The classification used, the fact that this category were people with mental handicaps and the others were large groups of people that didn't have those handicaps, that classification was so attenuated from what the legislature was trying to achieve, namely reduced traffic, reduced impact on infrastructure, that the law was arbitrary. The same rationale applies here, Your Honor. The supposed benefits of the public corporation ban are three degrees of indirect causation removed from what the law actually does. You have to go through three different steps of causation to get to a possible – the district court didn't find the law does this – but just a possible increase in the price of liquor and, therefore, an indirect slight reduction in the amount of consumption. Turn and look at what the law permits, just like in Claiborne where the law permitted the fraternity house or the apartment house. The law permits specs to have 158 stores, one in Houston with an 82,000-square-foot footprint appraised at $12 million. That's in the record at 10092. Twins can have 83 stores with a warehouse in Austin appraised at $4 million. That's 10094. The state is full of big, sophisticated companies aggressively competing with each other in the retail business. What is the logical basis for saying that somebody who happens to have more owners as part of their shareholders can't do the same thing? What about the argument that it's work, that liquor sales are relatively low compared to, say, beer and wine or whatever else? Is this the point I made earlier, the dry cities, or is that some other reason? There is no evidence, certainly none found by the district court, that Texas's historically low per capita consumption of liquor, which is rising, by the way, has anything to do with the laws that we challenged here. That predates by many, many years the public corporation ban, which went into effect in 1995. What about the argument that in 1995, when they passed it, they were still applying for the next 12 years the out-of-state ban, so they must have only been discriminated against in-state public corporations in passing that? Your Honor, that fact cuts in our favor because it's further evidence of the history of discrimination, which is a separate Arlington Heights factor. There's unrebutted testimony in the record and a finding by the district court that that Cooper decision was the but-for cause and the proximate cause of enacting the public corporation ban. TPSA had intervened in that first Cooper case, the Macbeth case. They knew full well what this court actually said, which wasn't limited at all to mixed beverages permits, and they knew what the result would be. The fact that it took TABC another 12 years to actually comply with this court's holding, demanded that another federal lawsuit happen, is further evidence of the history of discrimination that is behind this statute. Let me ask you this. When we look in the legislative history of this act, was there any evidence at a hearing or representations by the members of the body about wanting to pass this statute to reduce liquor consumption? No, there's not a shred of evidence of that, nor was that put before the legislature by the sole witness by TPSA. Some of the legislators made remarks about that, though. There's one exchange on the floor of the Senate where the sponsor of the bill, Senator Armbruster, answers questions from his colleagues asking why. Why are we banning public corporations? The district court found, as a matter of fact, that that exchange confirmed the discriminatory purpose. That is in paragraph 34 of the district court's opinion. That is a finding of fact. Like all the other issues under discriminatory purpose, that's a finding of fact reviewed for clear error, which means even if there's another permissible view of what that exchange said, the district court's view should control. We have a little filter in these cases that's different from a typical review, which is the filter in favor of the legislature's lawful intent. Your Honor, the presumption of the legislature's lawful intent is a separate doctrine under the Abbott v. Perez case where courts have been told by the Supreme Court that if the legislature did something bad before, like had some discrimination, don't put the burden on the legislature to cure that earlier taint. That didn't happen here. There's no question that the district court put any burden on the legislature to have cured the previous. I guess I'm wondering how is a legislature ever going to, I mean, Vesey v. Abbott, y'all keep siding, triggered some action by the Texas legislature absolutely responding to Vesey. And so then the question is, do we then say because you were responding to Vesey, that's discriminatory intent? Well, then a legislature could never respond to any decision, and we want them to respond. We want them to fix the problem. So we absolutely want them having ruled that something's unconstitutional to proceed on. They've got to have some sort of rule. You can't just show up and say you're Katharina Haynes and vote in the current city council elections in Texas. They want to have something, okay? So we want them to go and pass something that's not discriminatory that allows for people to be identified as the proper voter and so on and so forth. So they did that. Does that make it discriminatory because they were responding to our case? No, Your Honor. What would make it discriminatory is evidence that they were trying to do an end run and accomplish by means of a proxy the very thing they were doing before facially. And my point on the plain error review standard, this clear error review standard, was just that on this point, this audio of the transcript between Armbrister and Henderson, the district court heard that audio. The very first answer that was given by the sponsor of this bill when asked in front of the full Senate, why are we banning public corporations? First answer, so that Walmart can't own a package store. The last answer after he fumbled about saying that the law was about some tracking system or prohibiting businesses from operating the same, he agreed with his colleague that the reason for this was to have somebody from Texas with the license that you get hold of. That is – now, it's just one of many factors under Arlington Heights is legislative history. This court in the Lodge case – I don't agree that Walmart is a – and this can be taken as a compliment by Walmart, another word for a big company. I mean because Walmart is such a pervasive store in so many places. I mean I don't know that everybody in the world knows where Walmart is based, you know what I'm saying? So in other words, is that a translation out-of-state corporation or translation huge corporation that many people perceive as putting mom-and-pop stores out of business? Again, I'm not taking that position. I'm just saying some people do. That is not how it was taken by the TPSA that wrote this law, Your Honor. You can see throughout the flyers and the transcripts from 2019 to 2013 and to 2015 that Walmart has seen that synonymous with people coming in from out-of-state and taking away the local jobs. This was about protectionism and protecting the industry in Texas. But when he said someone from Texas, couldn't that be interpreted to mean that he's talking about somebody local enough that they can hold them accountable in the event there are problems? That goes to accountability, doesn't it? Your Honor, that could go to accountability. What I would like to say in response to that is that is the same excuse for applying what had been a facial residency requirement, the same excuse that had been trotted out just a year before in the Cooper decision and that this court held was in no way sufficient to justify a facial discrimination. Moreover, there's nothing in the public corporation ban that says anything about having somebody to get a hold of in Texas to enforce the code. Of course you can do that regardless of where the shareholders live. There's always an officer or someone who can be contacted in order to hold the corporation accountable. That was found as a matter of fact. You have one out-of-state public corporation that does sell liquor in Texas that was grandfathered in, as I understand it. Is that right? There are two corporations, Your Honor, that the record reveals were Texas public corporations before the ban and that the legislature made sure that those wouldn't be excluded by the public corporation ban through the grandfather clause. And since that time, there has been one significant out-of-state entrant, that's total one, that is not a public corporation, has less than 35 owners, so it has managed to enter, just the one. And in total, only 2% of all package store permits are held by any company with even a single out-of-state owner. Okay, thank you. We have your argument. Thank you, Your Honor. We'll hear from Mr. Sullivan. Okay. Your Honors, I'd like to start with an important question that I don't think my friend answered from Judge Haynes, and that is how do we determine who's similarly situated for purposes of comparing the before and after here to see if this law is valid? Again, as Judge Haynes noted, facial neutrality is a good place to start. In fact, this Court has said if the statute doesn't discriminate with respect to the place of domicile, then it's not going to be invalid. I mean, if Walmart decided that they love Texas so much that they're going to become a Texas company, it wouldn't change the fact they couldn't get a permit. That's exactly right, Your Honor. And so plaintiff's arguments show here, just as in all State, a legislative desire to treat two different business forms differently. And so when you base the law upon the corporate form rather than the place of domicile, then there's no problem. That's all State, 495 F-3rd at 161. This Court also made that same point in Ford at 264 F-3rd. You already have some pretty big corporations that are selling liquor in Texas, though, don't you? Well, Your Honor, there are a couple of outliers, such as Specs. But those companies are dwarfed in comparison with something like a Walmart. But is Specs a big corporation or a family with a lot of stores? It's a family with a lot of stores, Your Honor. So Mr. Walton's, I think it's Alice Walton, is the biggest. So Alice Walton could come in and open a bunch of stores by herself. She has billions, and still meet the test, right? Yes, Your Honor, under the Walton family. And I could be wrong on who the member of the Walton family is. I'm just trying to make it an individual with a lot of money could own a bunch of stores. And then if she had a sister or something, she could have hundreds of package licenses under this scheme, and nobody would say boo. That's correct, Your Honor. But on the point of protecting mom-and-pop stores, didn't I see in the record that a huge percentage of the liquor sales are by the chains, which are big, not corporations, but big businesses? So it's around 20 percent of the permits are held by the chain stores. Eighty percent of the permits are held by people who hold five permits or less, just mom-and-pop stores. Is that urban versus rural? That's across the state, Your Honor. But what I'm saying is, are the totals and the specs more in the Dallas's and Houston's? Yes, Your Honor. And the moms-and-pops are more in the Tyler's and Marshall's? That's roughly correct, Your Honor. I'll add one point to that. The largest chain store in the Dallas metroplex is actually the one from Maryland. It's a Total Wine. So I think this court has pointed out, and again, in all state and forward, that a burden can fall on interstate companies only, right? The ones that are from out of state. In fact, in all state, no Texas insurer was affected by the regulation. But importantly, in all state, just as in here, there were small companies that were coming in and were doing business under the same framework. So what's happening here is that Applebee's and the district court are confusing discrimination with these incidental burdens. And the incidental burdens test shows up under Pike all the time. And so just briefly on Pike, again, there's no problem here under Ford because we're treating similarly situated businesses in state and out of state the same. And Applebee's has certainly given us no theoretical justification for going beyond North Dakota and Brown Foreman. Because what we know is that Pike can't be used to overturn a law that deals with what Wine Country said is, quote, largely a state's prerogative. So here we don't have, and we haven't discussed the 21st Amendment today. The thing that makes this case even harder is just the interplay of the 21st Amendment with the Dormant Commerce Clause with all of this other case law that deals with voting rights. So the rule that we see from Granholm moving forward is the state can regulate with respect to alcohol fairly freely as long as it's not discriminating. And the test here, it goes back to the original points that we were talking about. You look at the statute, you look at how it's being played out, and that is covered by all state and Ford. Just one more point quickly to point out. Well, I read Granholm as holding that the M-State motive for passing the legislation wouldn't hold under the 21st Amendment. Well, so there, Your Honor, it was — it invalidated the law. Only to let the 21st Amendment control, and the majority said no. Because they were discriminating, not because actual discrimination was taking place.  Thank you, Your Honor. With the Court's indulgence, I'll touch on a couple of the evidentiary points that were just made because they were just flat wrong. Number one, the record in the legislature, actual record, House Research Organization, our Exhibit Number 9, Intervention Exhibit Number 9 says, the prohibition against public corporation ownership would also prevent the takeover of the packaged liquor store market by large corporations. By preventing corporate and chain store takeover, the bill would foster competition in the packaged liquor store market to keep prices reasonable. That is actually part of the legislative record. And what you will not find is anything in the legislative record that suggests there was an attempt to get around the residency ruling of Macbeth. Second — Who was the author of that? It's called the House Research Organization. What that entity — Somebody signed their name to it. The House Research Organization. It's an entity that actually operates as an arm of the legislature that combines the — what supporters are saying about a bill and what the opponents are saying about a bill and puts it into a formal report that becomes part of the legislative history. It is actually one of the few pieces of legislative history from 1995 that we actually have. Second, what you heard is that there is no evidence, stated right here, no evidence that Texas, in fact, is amongst the lowest in liquor consumption. Not so. The data — our exhibit, Interveners 39, Interveners 41, Interveners 54, this data and these charts reflect that Texas has historically been amongst the 10 lowest states in per capita liquor consumption. This chart is since 1970. Since 1941, this data reflects that Texas has historically been in the lowest in hard liquor consumption, while beer and wine has gone up dramatically. That was by design. Texas wanted to divert alcohol consumption here to beer — lower alcohol content beer and wine and keep the harder liquor at a lower level. That has, in fact, happened. And then — I don't know if you know whether that's true or not — that beer and wine has gone up and hard liquor has gone down. It's not — it's not clear on this record that that's, in fact, what happened. What's clear on this record is that — You're saying that Texas is still in the lowest 10, however the — However beer and wine has gone. And then, finally, Exhibit 54, in fact, this data is not controverted in this record at all by Walmart. Texas has been below the national trend in liquor consumption. And Texas has consistently been below it for decades. This is evidence in the record. Here's Walmart's evidence in the record on that same point. Here is what Walmart actually put in for their evidence. My question to their expert. You don't have an opinion and haven't developed any opinion on why Texas has low per capita liquor consumption, have you? His answer? No, sir, I do not. So, economics would pose the question, why does Texas have such a low excise tax on liquor and such a low per capita consumption in liquor? That's an interesting question to pose. You wouldn't necessarily see those together. So it would be interesting to know why that is, wouldn't it? His answer? It could be interesting, yes. And you haven't developed any opinion on that topic, have you? Answer? No, sir. This is in the record, ROA 10346, lines 16 through 20, and 10348, lines 2 through 11. That is Walmart's testimony. So what you just heard is exactly the opposite of what the record reflects. Please look at the record. Here's another example. You just heard about the exchange between Senators Armbruster and Senators Henderson on the floor in 1995. Please read that exchange. It's a grand total of about six transcript pages. It can be read in less than five minutes. It is at Our Plaintiffs' Exhibit 66, and it's at the record in 14019, 14025. When you read that exchange, you will see two things that are obvious, that are not consistent with what you just heard or what you see in the briefing. One, the exchange where it was said, yes, they had that they wanted a Texan to go get a hold of, that exchange. That had to do with a completely different bill from 1978 that dealt with an entirely different problem associated with Walgreens that Senator Henderson just happened to be familiar with. And he asked about that, and Senator Armbruster said, yes, that was the situation on that bill back in 1978 where Walgreens was trying to get around the residency requirement. They then turn around and finish the exchange by Senator Henderson saying, but this does not prevent foreign ownership. And Senator Armbruster says, that's exactly right. It doesn't touch foreign ownership. And so please look at the record. When you see these type of record references, finally, this case is decided by Exxon v. Governor Mellon and this Court's opinion in all state. Those control. I gave you all extra time. You all went over the extra time. Thank you. All of the attorneys were very helpful. We appreciate it. This concludes the arguments for today, and we'll adjourn until tomorrow at 9 a.m. Thank you.